IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KYLE R. COLEMAN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 13-cv-524-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kyle R. Coleman seeks judicial review of the final agency decision denying in part his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for benefits in September, 2009, alleging disability beginning on December 7, 2008. (Tr. 18). After holding an evidentiary hearing, ALJ Michael Scurry issued a partially favorable decision on February 24, 2012. The ALJ found that Mr. Coleman was not disabled from December 7, 2008, through January 3, 2012, but he became disabled as of January 4, 2012. (Tr. 18-27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 10.

1

timely complaint was filed in this Court.  Plaintiff filed a motion for summary judgment at **Doc. 18.**

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to consider and evaluate important medical evidence.

2. The ALJ's credibility determination was erroneous.

3. The ALJ erred in determining RFC.

4. The ALJ erred in in not giving appropriate weight to the opinions of his primary care physician, Dr. Altwal.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513**

**(7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  See also *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Coleman was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995**)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

4

***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined that plaintiff had not worked since the alleged onset date. He found that, before January 4, 2012, plaintiff had severe impairments of obesity, atrial fibrillation, non-ischemic cardiomyopathy, sleep apnea, lung hyperinflation, and right knee osteoarthritis. As of January 4, 2012, he had the additional impairment of disc herniation at L2-3, L3-4 and L4-5, which rendered him disabled. He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that, prior to January 4, 2012, Mr. Coleman had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. He was, however, not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1. Agency Forms**

Plaintiff was born in 1985, and was 23 years old on the alleged onset date. He was insured for DIB through December 31, 2013. (Tr. 191). In October, 2009, he was 6'8" tall and weighed 420 pounds. (Tr. 184). He alleged disability due to morbid obesity, heart problems and high blood pressure. (Tr. 195).

Plaintiff worked in the past as a stacker and shipper in a magazine printing facility, a sheet metal worker, a welder and a laborer. (Tr. 196). He has a high school education. (Tr. 201).

Plaintiff submitted a Function Report in November, 2009, in which he stated that he did very little on a regular basis. He mostly watched TV and rested. He prepared meals for himself consisting of sandwiches, frozen food, fruits and cereal. He did laundry and dishes for a few minutes. He was unable to do yard work because it put stress on his heart. He alleged difficulty walking, climbing stairs, lifting, squatting and completing tasks. (Tr. 207-214). In February, 2010, he reported that he was becoming short of breath while dressing and was having trouble losing weight, even with the help of a dietician. (Tr. 230). In April, 2010, he reported that "just walking while grocery shopping" made him short of breath. (Tr. 242).

### 2. Evidentiary Hearing

Mr. Coleman was represented by an attorney at the evidentiary hearing on January 6, 2012. (Tr. 35).

Plaintiff was 26 years old. He was 6'8" and weighed 405 pounds. He weighed about 365 pounds before he started having heart trouble. In January, 2008, he started feeling short of breath and exhausted. He moved back in with his mother in 2009, and was living with her at the time of the hearing. (Tr. 39-41).

He last worked as a wire welder in December, 2008. He started missing work because of his heart problems, and his production was suffering, so he was fired. (Tr. 46-47).

Mr. Coleman testified that he was unable to work because he was "always exhausted." Two days before the hearing, he started using a walker. He had been having back pain for about a month. He stretched a few days prior and felt something pop. His right leg had been numb since then. (Tr. 54). He had atrial fibrillation. A stress test showed that his heart was "beating at 30 percent of what it should be." He was taking medication to keep his blood pressure and heart rate down, but he still had an irregular heartbeat. He had two cardioversion procedures, but it did not work.[3] He had been told that nothing else could be done because he did not have insurance. (Tr. 56-58).

The ALJ asked plaintiff to describe his daily activities. He said that he spent most of his time sleeping or sitting with his feet up. He did very little around the

---

[3] Cardioversion is a procedure to "restore a fast or irregular heartbeat to a normal rhythm." It can be done using electrical shocks or medication. See, http://www.nhlbi.nih.gov/health/health-topics/topics/crv/, accessed on July 7, 2014.

7

house except pick up his clothes and occasionally do a load of laundry. (Tr. 61-63).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to only occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling, with no climbing of ladders, ropes or scaffolds. He should have no exposure moving machinery or heights, and no concentrated exposure to extreme temperatures or environmental irritants. The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which he could do. Examples of such jobs are clerical addresser and labeler, small product sorter, and telephone order clerk. (Tr. 67-69).

### 3. Medical Treatment

Mr. Coleman was admitted to the hospital through the emergency room in January, 2008, for a rapid heart rate in the 170s. He was diagnosed with acute atrial fibrillation with rapid ventricular response and mitral regurgitation. Echocardiogram showed "normal ventricular function of 61% and no abnormalities." Electrical cardioversion was unsuccessful. (Tr. 306-307). In February, 2008, a second unsuccessful attempt at electrical cardioversion was made. (Tr. 387-388).

On March 11, 2008, Dr. Andrew Rudin of the Carle Physician's Group noted that cardioversion had again been unsuccessful, and plaintiff had symptomatic recurrent persistent atrial fibrillation. He was placed on Digoxin and Metoprolol.

8

(Tr. 530).  In November, 2008, another doctor at the same group saw plaintiff. Cardiovascular exam was "irregularly irregular."  This doctor recommended that plaintiff be admitted to the hospital try another cardioversion in an "attempt to convert the patient to sinus rhythm and maintain him in sinus rhythm."  He also recommended a sleep study as sleep apnea might be a "strong contributing factor" to his atrial fibrillation.  (Tr. 547).  These procedures were not done at that time.

Plaintiff began seeing Dr. Shadi Altwal on July 22, 2009.  He had been out of medication for six months and had not been able to afford to see a doctor.  Dr. Atwal saw him regularly through at least January, 2012.  Dr. Atwal repeatedly noted irregular heart rhythm.  (Tr. 560-575, 618, 630, 652, 657).

In August, 2009, plaintiff saw a dietician.  He told her that he was trying to walk more, did some yard work and helped friends with vehicle repairs.  He was "unable to exercise" as he became short of breath and his heart pounded.  He set a goal of walking at a comfortable pace for 20 to 30 minutes each day.  He weighed 420 pounds.  His BMI was 45.4, which she said indicated "extreme obesity."  (Tr. 425).

In September. 2009, plaintiff told Dr. Altwal that he had no chest pain, but had increased fatigue.  He asked about another option to treat his atrial fibrillation.  He was referred to Dr. Charles Karpen, a cardiologist.

In September, 2009, an echocardiogram showed moderately decreased left ventricle systolic function and left ventricular ejection fraction of 39%.  (Tr. 421).

Plaintiff saw Dr. Karpen in October, 2009.  He noted that plaintiff had been scheduled for a repeat cardioversion, but he lost his insurance, and the procedure

was not done. Dr. Karpen reviewed the results of the recent echocardiogram, noting that it showed mild to moderate left ventricular enlargement with global hypokinesis and an ejection fraction of 39%. He said that plaintiff got short of breath if he ran, but he had minimal shortness of breath otherwise. An ECG from July, 2009, demonstrated atrial fibrillation. Dr. Karpen thought he had a tachycardia induced cardiomyopathy, but felt he needed further evaluation. He was taking Digoxin and Coumadin, and his heart rate was adequately controlled. Dr. Karpen "would not recommend trying to maintain normal sinus rhythm" as Mr. Coleman was "severely obese." Dr. Karpen also noted that he had a decreased ejection fraction, and he would speak with plaintiff regarding an ACE inhibitor. The doctor urged him to continue to try to lose weight. Further evaluation would be put off until he obtained a medical card. (Tr. 415-418).

      Dr. Karpen wrote a letter to Dr. Altwal, dated December 14, 2009, in which he said that Mr. Coleman "called complaining of worsening palpitations and chest pressure." He also reported increased shortness of breath. The letter is ambiguous as to whether Dr. Karpen saw Mr. Coleman in person thereafter, or just spoke to him on the phone. There is no separate office note documenting a visit. Mr. Coleman asked if there was anything more that could be done medically. Dr. Karpen stated that, "When I saw Mr. Coleman he was on a reasonable dose of beta-blocker and digoxin and his heart rate was well controlled." He also stated that his atrial fibrillation appeared under control. The doctor said that, "at this time an electrophysiologist likely would not attempt a rhythm control strategy." Dr. Karpen again recommended that Mr. Coleman have a stress test and a sleep

study, but he did not have the money to pay for this.   Dr. Karpen concluded that his underlying problem was his "severe obesity" and stressed "the poor overall prognosis with his weight at his young age."   Mr. Coleman said he would "await funding for further evaluation."  (Tr. 474).   Dr. Karpen did not see plaintiff again after this date.

In June, 2010, plaintiff complained to Dr. Altwal of occasional chest pain, not related to exertion.   He was having trouble sleeping and sometimes was awake all night.  (Tr. 568).  He complained of fatigue in September, 2010, and Dr. Altwal prescribed Ambien.  Although he was unable to afford Ambien, he reported sleeping better at the next visit.  He was taking his other medications as directed and reported no chest pain or shortness of breath.   (Tr. 570-571).   In November, 2010, Mr. Coleman was feeling sad and depressed because he had been getting worse over the years.  He had shortness of breath at night with no coughing or wheezing, and swelling in his legs.  Dr. Altwal noted that he needed a stress test and a sleep study, but could not afford them.  He prescribed Wellbutrin.  (Tr. 572).   Dr. Altwal changed his medication to Cymbalta in January 27, 2011, because Wellbutrin had not helped his moods.  (Tr. 573).   In February, 2011, plaintiff was again having chest pain, and agreed to undergo a stress test.  (Tr. 574).

A stress test was done on February 22, 2011.   This showed atrial fibrillation, left ventricular dilatation with right ventricular prominence and likely severe reduction in overall systolic function, with no evidence of ischemia or infarction.   Quantitation was "complicated by underlying arrhythmia." Ejection

fraction was 33%. (Tr. 609).

Sleep studies done in May and June, 2011, showed that plaintiff had obstructive sleep apnea which responded to CPAP. Both studies also demonstrated atrial fibrillation. (Tr. 621-622, 628-629).

In October, 2011, plaintiff reported to Dr. Altwal that he could not afford a CPAP machine. His mood was stable with no psychotic features. He was taking his medication as directed. He had lost twenty pounds. Mr. Coleman complained of an increase in left-sided chest pain not related to exertion. Dr. Altwal noted that a stress test had shown an ejection fraction of 30%. (Tr. 630).

Plaintiff went to the emergency room for back pain on January 4, 2012. Cardiac monitoring showed atrial fibrillation. (Tr. 648).

4. **Dr. Altwal's Opinions**

Dr. Altwal filled out a form entitled "Residual Functional Capacity Report" in November, 2011. The stated purpose of the form was to "determine the ability of Kyle Coleman to do work-related activities on a day-to-day basis in a regular work setting with the assumption that he is to engage in exertional activity no more demanding than the **sedentary** work level defined by the Social Security Regulations." (Tr. 634, emphasis in original). The form went on to explain the requirements of work at the sedentary exertional level.

Dr. Altwal indicated that he last saw plaintiff on October 7, 2011, and that his diagnoses were morbid obesity, atrial fibrillation, sleep apnea, depression, low back pain, degenerative disc disease, hypertension and cardiomyopathy. For objective findings, Dr. Atwal wrote "morbid obesity" and "irregular heart rate." He

12

indicated that Mr. Coleman's pain and fatigue would require him to take unscheduled breaks totaling an hour. Further, he would miss about three days of work a month because of his impairments or the need to seek medical treatment. These limitations had been in effect since July, 2009. (Tr. 634-636).

### Analysis

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." **Moore v. Colvin, 743 F.3d 1118, 1123 (7th Cir. 2014)**. This rule is long-standing. See, **Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009)**, and cases cited therein.

The ALJ's discussion of the medical evidence in this case is remarkably brief and omits reference to evidence favorable to the plaintiff.

ALJ Scurry concluded that the medical evidence does not support plaintiff's claim that he is unable to do even sedentary work. He relied heavily on Dr. Karpen's records for this conclusion. Dr. Karpen saw Mr. Coleman on October 20, 2009, and wrote a four page letter to Dr. Altwal thereafter. The ALJ honed in on two parts of letter. First, Mr. Coleman told Dr. Karpen that he had shortness of breath if he ran, but not really otherwise, and he exercised regularly. Secondly, according to the ALJ, Dr. Karpen "noted his heart appeared adequately controlled." The ALJ also referenced the statement in Dr. Karpen's second letter to Dr. Altwal that plaintiff's atrial fibrillation was under good control. (Tr. 24).

The ALJ's discussion of Dr. Karpen's records is inadequate. First, he

13

misquoted Dr. Karpen; the doctor wrote that Mr. Coleman's "heart *rate* appears adequately controlled" in October, 2009.  The ALJ erroneously said that Dr. Karpen wrote that Mr. Coleman's "heart appeared adequately controlled."  The Commissioner suggests that this error is insignificant.  See, Doc. 24, p. 6.  Footnote 2.  The Court disagrees.  The error is indicative of the ALJ's basic misunderstanding of the medical evidence, a misunderstanding that may well be shared by the Commissioner.

In his October, 2009, letter, Dr. Karpen pointed out that Mr. Coleman had undergone two unsuccessful cardioversion procedures, and a third procedure had been cancelled because he lost his insurance.  Dr. Karpen's letter drew a distinction between heart rate and rhythm.  While plaintiff's heart rate was controlled, Dr. Karpen said he "would not recommend trying to maintain normal sinus rhythm." (Tr. 418).  The ALJ appears not to have appreciated this distinction.

With respect to Dr. Karpen's second letter, the ALJ noted only that Dr. Karpen wrote that plaintiff's atrial fibrillation was under good control.  (Tr. 24).  This is an unrealistically optimistic summary of the letter.  The ALJ failed to acknowledge that Dr. Karpen's second letter was prompted by Mr. Coleman's phone call complaining of worsening palpitations and chest pressure, along with increased shortness of breath.  Further, Dr. Karpen said that an electrophysiologist "likely would not attempt a rhythm control strategy."  Dr. Karpen again recommended further testing, which plaintiff could not afford.  The ALJ also failed to mention that Dr. Karpen said that the underlying problem was

14

plaintiff's severe obesity, and warned that the overall prognosis was poor. (Tr. 474).

Dr. Karpen also noted that, a month earlier, an echocardiogram showed mild to moderate left ventricular enlargement with global hypokinesis and ejection fraction of 39%. The ALJ failed to mention this evidence at all. With regard to the stress testing and perfusion studies in February, 2011, the ALJ said only that it showed "atrial fibrillation but a low probably [sic] for ischemic heart disease." (Tr. 24). In fact, that testing, performed over a two-day period, showed left ventricular dilatation with right ventricular prominence and likely severe reduction in overall systolic function, with no evidence of ischemia or infarction. Quantitation was "complicated by underlying arrhythmia." Ejection fraction was 33%. (Tr. 609). The ALJ's highly selective discussion of this evidence was error, and again suggests that he did not fully understand its significance. The ALJ never mentioned the fact that Mr. Coleman's ejection fraction was reduced to 33%. Rather, he seemed to believe that, as Mr. Coleman had a low probability for ischemic heart disease, he did not have a serious heart condition.

The discussion of Dr. Altwal's records was also highly selective. Although Dr. Altwal saw plaintiff regularly from July, 2009, through January, 2012, the ALJ referred to only one visit, on October 22, 2010. The ALJ highlighted plaintiff's statement that his sleeping was improved and he had no chest pain or shortness of breath. (Tr. 24). This statement was taken out of context. In June, 2010, Mr. Coleman told Dr. Altwal that he was having trouble sleeping and sometimes was awake all night. On the next visit, in September, 2010, he reported insomnia,

15

increased fatigue, and fast heartbeat. Dr. Altwal prescribed Ambien. The October, 2010, note that was highlighted by the ALJ says simply "didn't get Ambien (expensive) but sleeping better." (Tr. 568-571). The ALJ failed to recognize the context of that statement, i.e., that he had gone from sometimes being awake all night to "sleeping better." Further, Dr. Altwal's note for that date indicates that he found edema in the bilateral lower extremities, which was ignored by the ALJ. (Tr. 571).

The ALJ also failed to note that, on other visits, plaintiff complained to Dr. Altwal of shortness of breath, palpitations, chest pain and fatigue. See, e.g., Tr. 560, 563, 563, 565, 566, 570, 625, 630, 570, 572, 574. Furthermore, Dr. Altwal detected an irregular heart rhythm on multiple visits. See, Tr. 560, 562-568, 570-575, 618, and 630.

The Commissioner's defense of this case is perfunctory. She argues that the evidence cited by plaintiff does not show that he has limitations more severe than those assessed by the ALJ. Doc. 24, p. 6. This argument misses the mark. The ALJ's highly selective review of the medical evidence undermines his findings as to plaintiff's credibility, the weight he afforded to Dr. Altwal's opinion, and his ultimate findings as to plaintiff's RFC. See, **Moore, 743 F.3d at 1122-1127.** The ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. **Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." **Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000)**.

The Commissioner recognizes that the ALJ is "required to build a logical bridge from the evidence to [his] conclusions." Doc. 24, p. 6, citing **Simila v. Astrue**, 573 F.3d 503, 516 (7th Cir. 2009). ALJ Scurry simply failed to do so here. As in **Moore**, he erred in presenting only a "skewed version of the evidence." **Moore**, 743 F.3d at 1123. As a result, his decision is lacking in evidentiary support and must be remanded. **Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Coleman was disabled before January 4, 2012, or that he should be awarded benefits for the period in question. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.[4]

## Conclusion

Plaintiff's motion for summary judgment **(Doc. 18)** is **GRANTED**.

The Commissioner's final decision denying Kyle R. Coleman's application for social security disability benefits for the period from December 7, 2008, through January 3, 2012, is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

---

[4] The Commissioner may wish to consider consulting a medical expert pursuant to 20 C.F.R. §404.1527(e).

**IT IS SO ORDERED.**

**DATE:   July 9, 2014.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

18